Filed 2/24/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re | B310753 |
| PAUL PALALAUA TUILAEPA, | (Los Angeles County Super. Ct. No. A035060) |
| on Habeas Corpus. | |

      APPEAL from an order of the Superior Court of Los Angeles County, Laura L. Laesecke, Judge. Reversed and remanded with instructions.

      Cuauhtemoc Ortega, Federal Public Defender, Marta Vanlandingham and Heather L. Pickerell, Deputy Federal Public Defenders, for Defendant and Appellant.

      Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, James William Bilderback II, Senior Assistant Attorney General, Dana Muhammad Ali and Colleen M. Tiedemann, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

# INTRODUCTION

In March 2016, Paul Palalaua Tuilaepa filed his third petition for a writ of habeas corpus in the California Supreme Court. Tuilaepa alleged he was intellectually disabled and his 1987 death sentence violated *Atkins v. Virginia* (2002) 536 U.S. 304 (*Atkins*), which held the Eighth Amendment prohibits execution of the intellectually disabled. He submitted declarations from two experts diagnosing him with an intellectual disability and another declaration from a third expert recanting flawed testimony about Tuilaepa's intellectual capacity at his original trial.

In November 2016, California voters enacted Proposition 66, the Death Penalty Reform and Savings Act of 2016 (as approved by voters, Gen. Elec. (Nov. 8, 2016), § 1). The initiative sought to limit the length of death penalty appeals and postconviction proceedings. To achieve this goal, it added section 1509 to the Penal Code, which barred untimely or "successive" capital habeas petitions "unless the court finds, by the preponderance of all available evidence . . . that the defendant is actually innocent . . . or is ineligible for the sentence." (§ 1509, subd. (d).)[1] This exception expressly provides that a court may consider claims of ineligibility for the death penalty by reason of "intellectual disability, as defined in Section 1376." (*Ibid.*)

This appeal raises issues of first impression about the application of section 1509 to petitions like Tuilaepa's that were filed but not adjudicated before Proposition 66 was enacted. The trial court concluded Tuilaepa's petition was procedurally barred

---

[1] All undesignated statutory references are to the Penal Code.

under section 1509 and that it did not state a prima facie case for relief on the basis of intellectual disability. The People now concede, and we agree, the trial court erred on both counts. Accordingly, we reverse and remand to the trial court with directions to issue an order to show cause on Tuilaepa's *Atkins* claim.

**FACTUAL AND PROCEDURAL BACKGROUND**

A. *Conviction and Sentence*

In 1986, Tuilaepa and an accomplice robbed a Long Beach bar and its patrons at gunpoint. When a patron resisted the robbery, Tuilaepa shot him in the jaw, which killed him. Tuilaepa then shot and injured three other bystanders.

In 1987, a jury convicted Tuilaepa of first degree murder (§ 187, subd. (a)), six counts of robbery (§ 211), one count of attempted robbery (§§ 211; 664), and two counts of assault with a firearm (§ 245, subd. (a)(2)). The jury found true a special circumstance allegation that Tuilaepa committed the murder during the commission of a robbery. (§ 190.2, subd. (a)(17)(i).)

At the penalty phase, Tuilaepa presented mitigation evidence about his upbringing and expert evidence regarding his intellectual ability. The defense expert, Dr. Michael Maloney, testified he administered psychological and intelligence tests to Tuilaepa and interviewed Tuilaepa's family. Dr. Maloney learned that Tuilaepa "grew up in Samoa and Hawaii and then came to Long Beach and spent the last perhaps ten years, nine years in the Long Beach area." Dr. Maloney testified:

> "It appears that [Tuilaepa] probably had normal
> intellectual potential or near there, but he simply has

3

a deficit in terms of what he has learned, his word knowledge in English and so forth, and this is not surprising given the different cultural background.

"His mother speaks no English at all. . . . So a lot of his interaction was in the Samoan language, and his early interaction was almost completely in the Samoan language.

"So, in terms of tests, he scores below average, but he seems to have had the potential to do much better than that. . . . You can come up with an IQ number, but it's really based on a lot of different variables. But if I had to do that and accepting the fact that [the IQ test] takes a lot of verbal things into account, he'd probably be in the low 70's, which would place him in the bottom five percent of the population."

After the close of the penalty proceeding, the jury returned a death sentence.

The California Supreme Court affirmed Tuilaepa's convictions and capital sentence on direct appeal. (See *People v. Tuilaepa* (1992) 4 Cal.4th 569, 577.) The United States Supreme Court granted certiorari in Tuilaepa's case to review the constitutionality of California's death penalty jury instructions and affirmed the judgment against Tuilaepa. (See *Tuilaepa v. California* (1994) 512 U.S. 967, 980.)

4

B.    *Prior Habeas Petitions*

Tuilaepa filed a petition for a writ of habeas corpus with the California Supreme Court in 1992, which the court denied in 1995.  In 1997, Tuilaepa filed a habeas petition in federal district court, amending his federal petition later that year to remove some newly stated, unexhausted claims.[2]

Tuilaepa filed a second state habeas petition in 1997 to exhaust his new state claims, which the California Supreme Court denied in 2006.  Tuilaepa then amended his federal petition in 2006 to reflect the exhaustion of these state claims.

In 2007, Tuilaepa moved to amend his federal habeas petition again, to add a claim that he was intellectually disabled and his death sentence violated *Atkins*.  The district court granted Tuilaepa leave in 2008 to file a third amended petition and stayed the federal habeas proceedings so that he could exhaust his *Atkins* claim in state court.  Tuilaepa successfully moved to relieve his postconviction counsel in 2015, and the district court appointed the Office of the Federal Public Defender to represent him.

C.    *Present Habeas Petition*

On March 15, 2016, through his new counsel, Tuilaepa filed a third state habeas petition in the California Supreme Court, asserting a claim under *Atkins* that he was ineligible for the death penalty due to intellectual disability.  Tuilaepa submitted declarations from Dr. James Patton and psychologist Dr. Dale

---

[2]    "Under federal law, remedies in state court must be exhausted (see 28 U.S.C. § 2554(b)(1)(A)) before a state prisoner can seek habeas corpus relief in the federal courts."  (*In re Zamudio Jimenez* (2010) 50 Cal.4th 951, 956.)

Watson attesting that, in their expert opinion, Tuilaepa met the diagnostic criteria for intellectual disability under clinical standards and as defined in section 1376, subdivision (a).  At the time of Tuilaepa's petition in 2016, former section 1376, subdivision (a), defined "intellectual disability" as "the condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested before 18 years of age."  (Stats. 2012, ch. 448, § 42, ch. 457, § 42; see *In re Hawthorne* (2005) 35 Cal.4th 40, 45-47 (*Hawthorne*) [extending definition of intellectual disability in section 1376 to postconviction *Atkins* claims on habeas review].)

Dr. Watson opined that Tuilaepa's academic background and his history of intellectual testing demonstrated "significant impairments in intellectual functioning" manifesting before the age of 18.  For instance, school records showed that Tuilaepa received an IQ score of 69 at 10 years old, more than "two standard deviations below the mean" and in the "Mildly Retarded" range.[3]  By fourth grade, Tuilaepa was placed in full-time special education classes for "educationally handicapped" students "due to both academic and behavioral deficits."  At 13 years old, Tuilaepa could "read most three letter words" and "compute simple math" but did not "speak in complete sentences" and lacked "multiplication [and] division" skills.  Juvenile incarceration records stated that, at 20 years old, Tuilaepa was still "function[ing] at the 4th to 5th grade level academically."  On subsequent IQ tests administered in 1987 (at age 21) and in 1997, Tuilaepa continued to perform "significantly below average."

---

[3]     This IQ range is now known as "Extremely Low."

Based on interviews with Tuilaepa's family members and educators and review of his social history, Dr. Patton and Dr. Watson both concluded that Tuilaepa exhibited significant impairments in adaptive functioning beginning in his youth.[4] Relatives reported that Tuilaepa was "illiterate or nearly illiterate" through his teenage years, had difficulty verbally expressing himself except in one-word answers, used informal sign language to communicate, and never "ha[d] a full conversation with anyone." As a child, Tuilaepa "was unable to understand, focus on, or complete, basic household tasks," like emptying the garbage, cleaning the bathroom, fetching a glass of water, buying groceries, telling time, or bathing and dressing himself. He was "unable to understand the rules" of children's games like hide and seek, flag football, or basketball, and he had "few, if any friends" because of his "trouble communicating." Family members described Tuilaepa as "suggestible," "gullible," "vulnerable to manipulation," "a follower," and "a frequent scapegoat for others' misdeeds." As a young adult, Tuilaepa was unable to drive, use public transportation, or perform "simple job[s]" such as picking produce or loading furniture.

After Tuilaepa's family moved from Samoa to the United States when he was five years old, his siblings recalled that

---

[4]     "Adaptive functioning," also known as "adaptive behavior," describes a person's "ability to function in the real world" and "meet[] community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background." Adaptive functioning skills include "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety."

Tuilaepa had "by far the most trouble, out of all the children in the family, learning English."  Tuilaepa also "never learned to speak or understand Samoan, even though he lived in Samoa until age five and his parents spoke [Samoan] exclusively at home."  For example, Tuilaepa could not recite the daily rosary with his family in Samoan, despite physical punishment for his failure to do so.

Tuilaepa attached a third declaration from Dr. Maloney, the defense expert in Tuilaepa's 1987 trial.  Dr. Maloney declared that in his original evaluation of Tuilaepa, he administered various intelligence tests, which indicated impaired intellectual functioning with "significant deficits in [Tuilaepa's] word knowledge and verbal reasoning."  In assessing the test results, Dr. Maloney sought to "account, or correct, for any possible influences of Mr. Tuilaepa's Samoan cultural background and native Samoan language."[5]

Dr. Maloney stated:

"When I testified at Mr. Tuilaepa's trial in 1987, I did not know that Mr. Tuilaepa had not learned to speak the Samoan language fluently, despite growing up in a household where Samoan was the predominant language spoken and where both parents spoke only Samoan.  It is unusual for a child to fail to become fluent in a language under those circumstances. . . .

---

[5]    The Penal Code now provides, "The results of a test measuring intellectual functioning shall not be changed or adjusted based on race, ethnicity, national origin, or socioeconomic status."  (§ 1376, subd. (h).)

8

"Had I known at the time of trial that Mr. Tuilaepa had not learned to speak Samoan fluently, I would have testified that th[is] fact strongly supported the conclusion that his intellectual functioning is impaired. . . .

"I also did not know at the time of trial that Mr. Tuilaepa was not given responsibilities for household chores in his family, or that he had difficulty with routine tasks such as emptying all the trash cans in the household.  This information further indicates that Mr. Tuilaepa's low IQ scores are not a result of cultural factors or of English not being his native language.  Rather, they are a reflection of intellectual impairments not totally related to culture."

The People filed an informal response opposing Tuilaepa's habeas petition as untimely, arguing the United States Supreme Court decided *Atkins* in 2002 and Tuilaepa's filing of his petition in 2016 constituted "unjustified and substantial delay."  The People further contended the petition failed to state a prima facie case for relief on the basis of intellectual disability because the expert declarations failed to establish Tuilaepa's "significantly subaverage general intellectual functioning."

While Tuilaepa's habeas petition was pending, voters approved Proposition 66 on November 8, 2016, which became effective in 2017.  (See *Briggs v. Brown* (2017) 3 Cal.5th 808, 822, 862 (*Briggs*).)  In May 2019, the California Supreme Court transferred Tuilaepa's petition to the Los Angeles County

9

Superior Court, pursuant to the new jurisdictional provisions of Proposition 66.  (See § 1509, subds. (a), (g).)

In December 2020, the superior court denied Tuilaepa's habeas petition at the prima facie stage without issuing an order to show cause.  The court first ruled the petition was procedurally barred because Tuilaepa "failed to justify [his] substantial delay of 14 years" before filing his petition after the *Atkins* decision.  The court declined to consider Tuilaepa's petition under the exceptions to untimeliness outlined in *In re Clark* (1993) 5 Cal.4th 750, 797-798 (*Clark*) because the petition did not allege a fundamental miscarriage of justice.[6]

The superior court further determined that, even if the petition were timely, it did not state a prima facie case for relief on the basis of intellectual disability under section 1376, subdivision (a).  The court faulted the expert declarations for failing to address what it perceived to be inconsistencies in Tuilaepa's test results and academic record, or the potential impact of Tuilaepa's childhood drug use, truancy, and juvenile incarceration on his adaptive functioning skills.  Because Tuilaepa failed to state a prima facie case for relief, the court

---

[6]	At the time Tuilaepa filed his petition, *Clark, supra,* 5 Cal.4th 750 allowed courts to consider an untimely or successive habeas petition if the petitioner alleged a fundamental miscarriage of justice.  (See *id.* at pp. 797-798.)  By the time the superior court considered Tuilaepa's petition, Proposition 66 replaced the *Clark* test with the narrower exceptions specified in section 1509.  (See *In re Friend* (2021) 11 Cal.5th 720, 742 (*Friend*).)  Although the superior court concluded section 1509 applied to Tuilaepa's petition, it also determined Tuilaepa's petition did not satisfy the exceptions in *Clark*.

10

decided his habeas petition did not satisfy any exception to untimeliness under section 1509 and must therefore be denied.

Tuilaepa timely appealed, consenting to appellate representation by the federal public defender. On October 5, 2022, this court granted Tuilaepa a certificate of appealability under section 1509.1, subdivision (c), on two issues: (1) whether the superior court erred in dismissing the habeas petition as successive; and (2) whether the court erred in dismissing the petition without issuing an order to show cause and conducting an evidentiary hearing on the *Atkins* claim.[7]

## DISCUSSION

Tuilaepa contends his habeas petition is not procedurally barred and that he has established a prima facie case for relief on the basis of intellectual disability. The People agree and concede the case should be remanded to the superior court. The parties disagree whether Proposition 66, effective 2017, and recent amendments to the statutory definition of intellectual disability, effective 2021 and 2025, apply to Tuilaepa's earlier-filed petition.

A.     *Legal Background and Standard of Review*

Our state Constitution secures the right to petition for a writ of habeas corpus. (See Cal. Const., art. I, § 11; see also

---

[7]     A "'successive'" petition is one "raising claims that could have been presented in a previous petition" without "adequate justification for the failure to present a particular claim . . . earlier." (*Friend*, *supra*, 11 Cal.5th at p. 731.) For this reason, we construed the trial court's dismissal order as deeming Tuilaepa's petition "'successive.'"

*People v. Duvall* (1995) 9 Cal.4th 464, 474 (*Duvall*).)  The Legislature has implemented the right to petition for habeas corpus through section 1473, subdivision (a).  (See *In re Cook* (2019) 7 Cal.5th 439, 452 (*Cook*).)  "In exercising habeas jurisdiction, the courts '"must abide by the procedures set forth"'" in the Penal Code.  (*Id.* at p. 457; see §§ 1473 to 1509.1.)

 "When presented with a petition for a writ of habeas corpus, a court must first determine whether the petition states a prima facie case for relief—that is, whether it states facts that, if true, entitle the petitioner to relief—and also whether the stated claims are for any reason procedurally barred."  (*People v. Romero* (1994) 8 Cal.4th 728, 737 (*Romero*); accord, *Cook*, *supra*, 7 Cal.5th at p. 457; *Maas v. Superior Court* (2016) 1 Cal.5th 962, 974.)  If the petition states a prima facie case and is not procedurally barred, "the court must issue a writ of habeas corpus or order to show cause, receive a return and traverse, and may, if necessary, order an evidentiary hearing on the claims."  (*Cook*, at p. 457; accord, *Romero*, at pp. 737-739; see § 1376, subd. (g) [when a habeas petitioner "makes a prima facie showing of intellectual disability, the reviewing court shall issue an order to show cause"].)  An evidentiary hearing enables the court to find facts and make credibility determinations necessary to adjudicate the petition.  (See *Cook*, at p. 457.)  Ultimately, the petitioner bears the burden to "'prove, by a preponderance of the evidence, facts that establish a basis for relief on habeas corpus.'"  (*In re Price* (2011) 51 Cal.4th 547, 559; see § 1376, subd. (g).)

 We review de novo the trial court's legal determinations that Tuilaepa's petition is procedurally barred and does not state a prima facie case for relief.  (See *In re Taylor* (2015) 60 Cal.4th 1019, 1035; *In re Hill* (2024) 104 Cal.App.5th 804, 825 (*Hill*).)  As

this appeal involves the application of Proposition 66 and section 1376, we interpret their provisions de novo. (See *People v. Gonzales* (2018) 6 Cal.5th 44, 49.) We also review de novo whether the statute applies retroactively. (See *In re Marriage of Fellows* (2006) 39 Cal.4th 179, 183; *Dragones v. Calkins* (2024) 98 Cal.App.5th 1075, 1081.)

B.    *Tuilaepa's Petition Is Not Procedurally Barred*

We first consider whether Tuilaepa's *Atkins* claim is "for any reason procedurally barred" (*Romero*, 8 Cal.4th at p. 737), and the effect of Proposition 66 on his petition.

To prevent "abuse of the writ [of habeas corpus] process," courts have traditionally barred petitioners from filing "successive" habeas petitions. (*Friend, supra,* 11 Cal.5th at pp. 720, 727-728; accord, *In re Maury* (2024) 105 Cal.App.5th 645, 661; *In re Seumanu* (2024) 100 Cal.App.5th 599, 620.) Under this rule, a habeas petitioner must "present all known claims in a single, timely petition," and "[b]efore a successive petition will be entertained on its merits the petitioner must explain and justify the failure to present claims in a timely manner in his prior petition or petitions." (*Clark*, *supra*, 5 Cal.4th at pp. 774, 797, superseded by statute as stated in *Briggs, supra,* 3 Cal.5th 808.)

In *Clark*, the California Supreme Court articulated four exceptions to the traditional rule. A court may consider a successive petition that alleges "a *fundamental* miscarriage of justice" through (1) fundamentally unfair constitutional error without which no reasonable trier of fact would have convicted the petitioner; (2) actual innocence; (3) imposition of the death penalty based on a "grossly misleading profile of the petitioner" without which no sentencing authority would have imposed

13

death; or (4) conviction or sentence under an invalid statute. (*Clark, supra*, 5 Cal.4th at pp. 797-798.)

With Proposition 66, which took effect on October 25, 2017, California voters changed habeas proceedings in capital cases. The initiative was intended as "an extensive reform of the entire system of capital punishment to make it more efficient, less expensive, and more responsive to the rights of victims." (*Briggs, supra,* 3 Cal.5th at p. 831.)  As relevant here, Proposition 66 added sections 1509 and 1509.1, which imposed a one-year filing deadline for capital habeas petitions (§ 1509, subd. (c)), redirected such petitions from the California Supreme Court to the sentencing courts (§ 1509, subd. (a)), and adopted new procedures for appellate review of capital habeas petitions (§ 1509.1, subd. (a)).  (See *Friend*, *supra*, 11 Cal.5th at pp. 725-726.)  Proposition 66 amended section 190.6 to direct the Judicial Council to adopt rules expediting capital appeals and habeas proceedings, and to provide that "[w]ithin five years of the adoption of [these] rules or the entry of judgment, whichever is later, the state courts shall complete the state appeal and the initial state habeas corpus review in capital cases." (§ 190.6, subd. (d); see *Briggs*, at pp. 823-824, 858 [holding five-year deadline is not mandatory].)

Proposition 66 also modified, for capital cases, the common-law rule against successive petitions.  As relevant here, section 1509, subdivision (d), provides:  "An initial petition which is untimely under subdivision (c) or a successive petition whenever filed shall be dismissed unless the court finds, by the preponderance of all available evidence, whether or not admissible at trial, that the defendant is actually innocent of the crime of which he or she was convicted or is ineligible for the

14

sentence." The statute further states, "'Ineligible for the sentence of death' means that circumstances exist placing that sentence outside the range of the sentencer's discretion. Claims of ineligibility include . . . a claim that the defendant has an intellectual disability, as defined in Section 1376." (§ 1509, subd. (d).)

In *Friend*, *supra*, 11 Cal.5th 720, the California Supreme Court explained that, after Proposition 66, second or subsequent habeas claims are not barred as "successive" under section 1509, subdivision (d), "if the petitioner offers adequate justification for the failure to present a particular claim in an earlier petition." (*Friend*, at p. 731.) This includes claims based on newly discovered evidence; a new, retroactive change in the law; or the ineffective assistance of prior counsel. (See *ibid.*) But when a petitioner cannot justify raising new claims in a subsequent petition, section 1509, subdivision (d), "replace[s] . . . *Clark*'s substantive exception for fundamental miscarriages of justice with a narrower exception limited to claims of innocence or ineligibility." (*Friend,* at pp. 739-740.) Accordingly, "under the law as amended by Proposition 66, habeas corpus petitioners must make a showing of actual innocence or death ineligibility if they seek a second chance to make an argument they could have made earlier." (*Id.* at p. 724.)

1. *Section 1509, Subdivision (d), Added by Proposition 66, Applies Retroactively to Tuilaepa's Petition*

Tuilaepa argues that, because he filed his petition before the passage of Proposition 66, "[s]ection 1509(d) is a prospective statute that cannot be applied retroactively to [his] *Atkins* claim."

15

He argues instead that *Clark* should apply, and that he has shown justifiable delay in bringing his *Atkins* claim, or in the alternative, that he has demonstrated a "fundamental miscarriage of justice" under *Clark*.[8]

We conclude that section 1509, subdivision (d), applies retroactively to Tuilaepa's petition because his petition was pending on the date Proposition 66 became effective.[9] "Although statutes 'are generally presumed to operate prospectively and not retroactively,' this presumption is rebuttable." (*Preston v. State Bd. of Equalization* (2001) 25 Cal.4th 197, 222 (*Preston*).) Whether a law applies retroactively turns on "the intent of the Legislature, or in the case of a ballot measure, the intent of the electorate." (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 307; accord, *Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 230.) We consult the usual indicators of the electorate's intent: first, the initiative's language, then extrinsic sources like the voter ballot pamphlet, and finally, ""the object in view, the evils to be remedied, the history of the times

---

[8] Tuilaepa does not argue he has a due process interest in the application of the prior standard. (See *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 592; cf. *Friend*, *supra*, 11 Cal.5th at p. 740, fn. 14 [leaving undecided any constitutional issues raised by the replacement of the *Clark* standard].)

[9] The People contend that we need not address "the superior court's determination of successiveness and untimeliness" because "[o]n remand, Tuilaepa can overcome section 1509, subdivision (d)'s prohibition on successive petitions if he can demonstrate 'by the preponderance of all available evidence . . . that [he] . . . is ineligible for [his death] sentence.'" We reach the issue to provide guidance to superior courts applying Proposition 66.

and of legislation upon the same subject.""" (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1209-1210, 1212 (*Evangelatos*); see *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 587.) "Even without an express declaration [of retroactivity], a statute may apply retroactively if there is "'a clear and compelling implication'" that the Legislature [or voters] intended such a result." (*People v. Alford* (2007) 42 Cal.4th 749, 753 (*Alford*).)

Although section 1509 itself does not contain an express retroactivity provision, the language of Proposition 66 clearly reflects retroactive intent such that section 1509, subdivision (d), applies to petitions pending on its effective date. Section 19 of Proposition 66 declared "all sections of this act take effect immediately upon enactment and apply to all proceedings conducted on or after the effective date." (Initiative Measure Prop. 66, § 19, approved Nov. 8, 2016, eff. Oct. 25, 2017.) Subdivision (a) of section 1509 states, without limitation, "This section applies to any petition for writ of habeas corpus filed by a person in custody pursuant to a judgment of death." Further, subdivision (g) provides for transferring already-pending petitions from the California Supreme Court to the superior court: "'If a habeas corpus petition is pending on the effective date of this section, the court may transfer the petition to the court which imposed the sentence.'" (*In re Robinson* (2019) 35 Cal.App.5th 421, 426 (*Robinson*) [concluding Proposition 66 applies retroactively to capital habeas petitions filed before its enactment, because "the statute specifically contemplates what to do to pre-Proposition petitions"]; see *Bank of America v. Angel View Crippled Children's Foundation* (1999) 72 Cal.App.4th 451, 457-458 [discerning retroactive intent from statutory provision

17

indicating application to pending cases]; *Yoshioka v. Superior Court* (1997) 58 Cal.App.4th 972, 980-981 [same].)

Extrinsic indicators confirm the voters intended section 1509, subdivision (d), would apply retroactively. The "Analysis by the Legislative Analyst" in the ballot pamphlet explained that "the vast majority" of individuals subject to the death penalty "are [in] various stages of the direct appeal or habeas corpus petition process" and "[t]hese legal challenges . . . can take a couple of decades to complete." (Voter Information Guide, Gen. Elect. (Nov. 8, 2016) analysis of Prop. 66, p. 105.) The pamphlet stated that the proposed five-year time limit on appeals and initial habeas proceedings "would apply to new legal challenges, as well as those currently pending in court." (*Id.* at p. 106.) The analysis explained, "In order to help meet [these] time frames, the measure places other limits on legal challenges to death sentences. For example, the measure does not allow additional habeas corpus petitions to be filed after the first petition is filed, except in those cases where the court finds that the defendant is likely either innocent or not eligible for the death sentence." (*Id.* at p. 106.) From these representations, it is clear the electorate contemplated that Proposition 66's new limitations on successive claims would impact pending habeas petitions. (Cf. *Evangelatos*, *supra*, 44 Cal.3d at p. 1212 [where no analysis or statements "in the ballot pamphlet spoke to the retroactivity question . . . there is no reason to believe that the electorate harbored any specific thoughts or intent with respect to the retroactivity issue at all"].)

The purpose underlying Proposition 66 further supports retroactive application of section 1509, subdivision (d). As our colleagues in Division Two of the Second District have observed,

18

"Proposition 66 was enacted to '[r]eform[] the existing inefficient appeals process for death penalty cases,' in part by removing the backlog of habeas corpus petitions pending before the Supreme Court by redistributing those petitions to the pertinent superior courts around the state for orderly disposition. [Citation.] This purpose is furthered by subjecting all pending petitions to Proposition 66's new process." (*Robinson*, *supra*, 35 Cal.App.5th at pp. 426-427 [italics omitted]; see *Alford*, *supra*, 42 Cal.4th at p. 754 [determining court fee statute applied retroactively because prospective application would not "produce[] the needed revenue" in the time described]; *People v. Vinson* (2011) 193 Cal.App.4th 1190, 1199 [legislative purpose to offset costs of prison overcrowding supported retroactive application].)

2. *Section 1509, subdivision (d), Does Not Bar Tuilaepa's Claim of Ineligibility for the Death Penalty*

Although we conclude section 1509, subdivision (d), applies to Tuilaepa's petition, Tuilaepa contends, the People concede, and we agree Tuilaepa's petition is not procedurally barred as a "successive petition" or untimely petition. Section 1509, subdivision (d), authorizes successive or untimely habeas petitions from capital defendants that show by a "preponderance of all available evidence . . . that the defendant is actually innocent . . . or is ineligible for the sentence."[10] Because we conclude below that Tuilaepa establishes a prima facie case for

---

[10] Tuilaepa maintains his *Atkins* claim is not untimely or successive, primarily because his prior attorneys rendered ineffective assistance from 2009 to 2015. In light of our conclusion that his petition is not procedurally barred, we need not reach this argument.

19

relief on the basis of intellectual disability under *Atkins*, he has sufficiently demonstrated at this juncture that he "is ineligible for the sentence" and his petition is not barred by section 1509, subdivision (d).  (See *Friend*, *supra*, 11 Cal.5th at p. 727 [courts may consider successive petitions that are "[]accompanied by a showing of innocence or ineligibility for the death penalty"].)

C.    *Tuilaepa's Petition States a Prima Facie Case for Relief*

We consider next whether Tuilaepa stated a prima facie *Atkins* claim—that is, whether he "states facts that, if true, entitle [him] to relief."  (*Romero*, *supra*, 8 Cal.4th at p. 737.) Tuilaepa argues, the People concede, and we agree, that Tuilaepa made the requisite prima facie showing under section 1376 as amended and is entitled to an evidentiary hearing.

In *Atkins*, the United States Supreme Court established that the Eighth Amendment prohibits the execution of intellectually disabled defendants.  (See *Atkins*, *supra*, 536 U.S. at p. 321.)  The Court observed that "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills . . . that became manifest before age 18," but it left to the states "'the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'"  (*Id.* at pp. 317-318.)

Drawing upon *Atkins*, in 2003 the Legislature added section 1376 to the Penal Code.  That provision defines intellectual disability, provides that intellectually disabled individuals are ineligible for the death penalty, and creates procedures for adjudicating claims of intellectual disability in capital prosecutions.  (Stats. 2003, ch. 700, § 1; see *Hawthorne*,

20

*supra*, 35 Cal.4th at p. 47 [extending section 1376 to postconviction habeas claims of intellectual disability].)  As stated, at the time Tuilaepa filed his petition in 2016, section 1376 defined intellectual disability as "the condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested before 18 years of age."  (Stats. 2012, ch. 448, § 42.)

After Tuilaepa filed his petition and the trial court denied it, the Legislature has twice amended the definition of intellectual disability in section 1376, aligning its definition with clinical standards.

Effective 2021, the Legislature determined that intellectual disability must manifest "before the end of the developmental period, as defined by clinical standards," rather than before the age of 18.  (§ 1376, subd. (a)(1), as amended by Stats. 2020, ch. 331, § 2.)  This amendment also clarified that a "'[p]rima facie showing of intellectual disability' means that the defendant's allegation of intellectual disability is based on the type of evidence typically relied on by a qualified expert in diagnosing intellectual disability, as defined in current clinical standards, or when a qualified expert provides a declaration diagnosing the defendant as intellectually disabled."  (§ 1376, subd. (a)(2), as amended by Stats. 2020, ch. 331, § 2.)

The Legislature further amended section 1376 and as of 2025, that provision clarified that "'[m]anifested before the end of the developmental period' means that the deficits were present during the developmental period.  It does not require a formal diagnosis of intellectual disability, or tests of intellectual functioning in the intellectual disability range, before the end of

21

the developmental period." (§ 1376, subd. (a)(2), as amended by Stats. 2024, ch. 908, § 2.)

Tuilaepa suggests that because he filed his petition in 2016 and his expert declarations utilized the pre-2021 definition of "intellectual disability," we should apply the unamended statutory provision.[11] The People argue that the "current version" of section 1376 applies. We conclude the current statutory definition applies to Tuilaepa's petition because the intervening amendments altered the procedural standards applicable to prima facie determinations. (See, e.g., *Friend*, *supra*, 11 Cal.5th at p. 743 ["Employing current statutory procedures in current litigation is not ordinarily considered a retroactive application of the statute."]; *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 288 (*Tapia*) [procedural amendments apply prospectively to all future procedural events, even if proceedings were pending prior to amendment].) The amendments, which broaden the definition of intellectual disability and lower the bar for establishing a prima facie case, are also ameliorative because they enlarge the class of intellectually disabled capital defendants eligible for relief. (See *Tapia*, at p. 301, citing *In re Estrada* (1965) 63 Cal.2d 740, 745.)

---

[11] Although Tuilaepa's expert declarations are tailored to the 2016 definition of intellectual disability, as the trial court observed, not all the evidence the experts discussed "pre-dated [Tuilaepa's] 18th birthday in 1983." Other evidence of intellectual disability included "declarations and reports . . . written in preparation for trial in 1986," when Tuilaepa was 21. In light of the changes in the law since Tuilaepa filed his petition, on remand he is entitled to file supplemental declarations or other probative evidence of intellectual disability under the current definition of "developmental period" in section 1376.

In all events, Tuilaepa has made a prima facie showing for relief based on intellectual disability under any applicable version of section 1376. A prima facie showing under *Atkins* is made with an expert declaration "set[ting] forth a factual basis for finding the petitioner has significantly subaverage intellectual functioning and deficiencies in adaptive behavior," which either manifested before the age of 18 (under the version of section 1376 in effect when Tuilaepa filed his petition) or the end of the clinically defined developmental period (under the current version of section 1376). (*Hawthorne, supra*, 35 Cal.4th at p. 48; accord, *People v. Powell* (2018) 6 Cal.5th 136, 192; see § 1376, subd. (a)(1); former § 1376, subd. (a), as amended by Stats. 2012, ch. 457, § 42.)

At the prima facie stage, "the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if the petitioner's factual allegations were proved. If so, the court must issue an order to show cause." (Cal. Rules of Court, rule 4.551(c)(1); see *In re Jenkins* (2023) 14 Cal.5th 493, 519.) A petitioner must "state fully and with particularity the facts on which relief is sought" and "include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations." (*Duvall, supra*, 9 Cal.4th at p. 474.) ""Conclusory allegations made without any explanation of the basis for the allegations do not warrant relief."" (*Jenkins*, at p. 519.) Likewise, if the record "contain[s] facts refuting the allegations made in the petition . . . the court is justified in making a credibility determination adverse to the petitioner." (*In re Serrano* (1995) 10 Cal.4th 447, 456 (*Serrano*).

Here, Tuilaepa submitted two expert declarations that met the criteria for intellectual disability under both the former and amended version of section 1376, and another declaration that retracted contrary evidence at his original trial.  Dr. Watson's declaration diagnosed Tuilaepa as intellectually disabled under clinical standards, stating, "[I]n my professional opinion, the evidence supports the conclusion that Mr. Tuilaepa suffers from Intellectual Disability ("ID"), as that term is defined under California law, as well as by the AAIDD [American Association on Intellectual and Developmental Disabilities] Manual and DSM-5 [American Psychological Association's Diagnostic and Statistical Manual]."  (See § 1376, subd. (a)(3).)  The declarations also tracked the statutory definition for intellectual disability.  (See *id.*, subd. (a)(1).)  Citing Tuilaepa's testing and social history, Dr. Watson identified "significant impairments" in Tuilaepa's intellectual functioning and adaptive functioning manifesting before age 18.  Dr. Patton, a special education expert, concurred that Tuilaepa "exhibited significant adaptive deficits" before 18, as defined by the AAIDD and the DSM-5.  These declarations made an "evidentiary showing sufficient to meet the statutory threshold entitling [Tuilaepa] to a hearing" on the question of his intellectual disability.  (*Hawthorne, supra,* 35 Cal.4th at p. 51 [neuropsychologist's declaration describing petitioner's childhood impairments and subaverage IQ testing met prima facie standard].)

The trial court did not accept as true Tuilaepa's allegations and supporting expert declarations.  Instead, it erred by weighing the facts from the expert declarations against other facts in the

24

record, and by assessing the credibility of the expert conclusions.[12]

By way of example, the superior court rejected Dr. Patton's conclusion that school records and firsthand accounts of Tuilaepa's childhood demonstrated impaired adaptive functioning because Dr. Patton did not address the potential impact of Tuilaepa's "intermittent [juvenile] incarceration" or "drug use" on his adaptive functioning. The trial court similarly disputed Dr. Watson's assertion that Tuilaepa had significantly subaverage intellectual functioning. Although Dr. Watson factually based this conclusion on Tuilaepa's IQ test results and academic record, the court dismissed Dr. Watson's conclusion with evidence of Tuilaepa's "Cs" and "Bs" grades while in juvenile detention. These countervailing facts cited by the court did not entirely "refut[e]" Tuilaepa's allegations, such that the court could reject his allegations altogether. (*Serrano*, *supra*, 10 Cal.4th at p. 456.) "At the prima facie stage, the trial court should have focused on the accuracy and significance of [Tuilaepa's] proffered facts, rather than weighing his evidence against . . . contrary . . . testimony." (*Finley v. Superior Court* (2023) 95 Cal.App.5th 12, 24; cf. *People v. Lewis* (2021) 11 Cal.5th 952, 972 [prima facie inquiry does not entail "'factfinding involving the weighing of evidence'"].)

The trial court also prematurely assessed the credibility of the expert declarations. For instance, Dr. Watson explained that Tuilaepa achieved an "average" score on the Leiter IQ test, designed for "those who do not speak English," but he explained

---

[12] The People did not argue, and the trial court did not conclude, that Tuilaepa's experts were not qualified or that their declarations were inadmissible on evidentiary grounds.

25

"the Leiter score provides an incomplete assessment of [Tuilaepa's] intellectual functioning, because it excludes consideration of verbal intelligence," which was "shown to be impaired in Mr. Tuilaepa's case."  The trial court rejected this assertion, concluding that Tuilaepa's average Leiter score "contradicted" Dr. Watson's finding of intellectual disability and commenting that "under [Dr. Watson's] reasoning, the Leiter test should never be given."  The trial court also credited Dr. Maloney's trial testimony that Tuilaepa had "normal intellectual potential" over Dr. Maloney's new opinion, which was informed by more context about Tuilaepa's upbringing, that Tuilaepa's "intellectual functioning is impaired."  (See *Serrano, supra*, 10 Cal.4th at p. 456 [habeas court should not reject a petitioner's allegations on credibility grounds "without first conducting an evidentiary hearing"].)

At the prima facie stage, Tuilaepa "was not required to *prove* his allegations, only to demonstrate that a claim would be stated if the allegations were true."  (*Hill, supra*, 104 Cal.App.5th at p. 834.)  Accepting the allegations in his habeas petition as true, Tuilaepa established a prima facie case for relief on the basis of intellectual disability.

D.    *Tuilaepa Does Not Establish Grounds for Judicial Disqualification Under Code of Civil Procedure Section 170.1*

For the first time in his reply brief, Tuilaepa asserted the trial court's order denying his habeas petition "exhibit[ed] prejudice against the qualified experts, [and] the evidence on which they based their conclusions."  He requested to have his case assigned to a different judge on remand under section 170.1,

subdivision (c), of the Code of Civil Procedure on this basis.[13]  The People moved to strike this argument or in the alternative requested leave to file a sur-reply addressing this new argument. We granted the latter and consider Tuilaepa's argument on the merits.

Section 170.1 provides for disqualification if "[a] person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial."  (Code Civ. Proc., § 170.1, subd. (a)(6)(A)(iii).)  "An appellate court must exercise its power to disqualify a judge under that statute sparingly, and only when the interests of justice require it."  (*People v. LaBlanc* (2015) 238 Cal.App.4th 1059, 1079.)  While the trial court erred in denying Tuilaepa's petition, "[m]ere judicial error does not establish bias and normally is not a proper ground for disqualification."  (*Ibid.*)  Without more facts suggesting judicial bias, we decline Tuilaepa's request to assign this case to a different trial judge on remand.  (See *id.* at p. 1080 [although trial judge erred, he was not biased where his understanding of the legal standards comported with the applicable statute and he made no comments suggesting "he could not come to a different conclusion" on remand]; accord, *Rab v. Weber* (2023) 91 Cal.App.5th 1337, 1353 ["'[e]rroneous rulings against a litigant . . . do not establish a charge of bias and prejudice'"].)

---

[13]    This section provides:  "At the request of a party or on its own motion an appellate court shall consider whether in the interests of justice it should direct that further proceedings be heard before a trial judge other than the judge whose judgment or order was reviewed by the appellate court."  (Code Civ. Proc., § 170.1, subd. (c).)

## DISPOSITION

The order denying the petition for a writ of habeas corpus is reversed.  The matter is remanded to the trial court with directions to issue an order to show cause.


MARTINEZ, P. J.

We concur:


FEUER, J.


STONE, J.